Stella HULL, Plaintiff–Appellant,

v.

CUYAHOGA VALLEY JOINT VOCATIONAL SCHOOL DISTRICT BOARD OF EDUCATION, et al., Defendants–Appellees.

No. 90–3360.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 23, 1991.

Decided Feb. 15, 1991.

Rehearing Denied March 20, 1991.

Steven D. Shafron, George W. Palda (argued), Berkman, Gordon, Murray & Palda, Cleveland, Ohio, for plaintiff-appellant.

Ronald V. Rawlin, Rhoa, Follen & Rawlin, Timothy J. Sheeran, David K. Smith, Helen Kryshtalowych (argued), Squire, Sanders & Dempsey, Cleveland, Ohio, for defendants-appellees.

Before KEITH and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Plaintiff-appellant, Stella Hull, appeals the district court's grant of summary judgment to defendants-appellees, the Cuyahoga Valley Joint Vocational School District Board of Education, its superintendent, Jerry Schuck, its executive director, George Plance, and a school administrator, Gary Romes, for violation of 42 U.S.C. §§ 1981, 1983, and 1985(3). For the following reasons, the judgment of the district court is affirmed in part and reversed in part.

## I.

From December 1982 until the end of the 1986–87 school year, plaintiff-appellant Stella Hull, was employed by defendant-appellee, the Cuyahoga Valley Joint Vocational School District Board of Education [hereinafter, the "Board"] under a limited (non-tenured) contract. The Board is a public body authorized by statute to manage the Cuyahoga Valley Joint Vocational School [hereinafter, "Cuyahoga Valley" or the "school"] where plaintiff worked. The three individual defendants are: Jerry Schuck, superintendent of the Cuyahoga Valley Joint Vocational School District [hereinafter, the "district"]; George Plance, executive director of the district; and Gary Romes, a vocational supervisor at the school.

In 1982, plaintiff, a black female, was hired to teach word processing enrichment to "home school students," high school students from the joint vocational school's constituent districts who did not attend the vocational school. Concerned that the program would be short-lived, plaintiff applied to teach the junior data processing course and the medical secretary course. Her applications for reassignment to regular classroom positions were denied by defendant Plance, the executive director of the district. When she was not hired for a regular classroom teaching position, plaintiff continued to teach the word processing enrichment course for the next two school years. In 1985, plaintiff applied for and was reassigned to teach a new course, Advanced Business Technology [hereinafter, "ABT"]. Romes, a vocational supervisor at the school, evaluated Hull's teaching performance as the ABT instructor, found it to be unsatisfactory, and recommended reassignment.

Plance, who was in charge of personnel, reassigned Hull to the word processing enrichment program for the 1986–87 school year. In February 1987, Hull met with defendant Plance, who told her that the enrichment program might be abolished the following school year. On April 5, 1987, Hull met at her request with defendant Schuck, the district superintendent who makes recommendations to the Board on the renewal or non-renewal of teaching contracts. In response to Hull's inquiry about her employment status for the following year, Schuck told her that he would recommend to the Board that it not renew her contract. When Hull asked the reasons, Schuck responded that "he could not discuss [the decision] for legal reasons." Schuck also told plaintiff that she "had not found a good match for the district," "had not found her niche," and "did not fit in." When asked what he meant by those remarks, Schuck told Mrs. Hull that she was making him feel uncomfortable.

After plaintiff received written notice from Schuck about his recommendation to the Board, Mrs. Hull began telephoning school board members. She reached five of the ten members and explained her situation to them, although she did not state that she believed her contract was being non-renewed because she was black. Several Board members asked Mrs. Hull to supply them with material and one said he would look into possible racial discrimina-

tion. On April 15, 1987, acting upon Schuck's recommendation, the Board voted unanimously not to renew plaintiff's teaching contract for the 1987–88 school year.

On April 5, 1989, plaintiff filed a complaint against the Board, the ten Board members, Jerry Schuck, the district superintendent, George Plance, the executive director, and Gary Romes, a school supervisor. In an amended complaint filed August 23, 1989, plaintiff alleged that defendants-appellees discriminated against her because of her race. Counts one, two, and three of the amended complaint alleged racial discrimination in violation of 42 U.S.C. § 1981. Counts four and five alleged the same in violation of 42 U.S.C. § 1983. Count six alleged a racially motivated conspiracy between defendants Schuck, Plance and Romes in violation of 42 U.S.C. § 1985(3). Count seven alleged a pendent state claim of tortious interference with an employment contract. The individual defendants, Schuck, Plance, Romes and the Board members, were sued in both their personal and official capacities.[1]

Hull alleged that during her employment, defendants Schuck, Plance and Romes discriminated against her because of race in the following ways:

Prior to 1985, Hull was denied the opportunity to teach regular classroom courses involving secretarial work and data processing;

In 1985, Romes refused to excuse Hull from cafeteria duty;

Romes unfavorably evaluated Hull's teaching performance as the ABT course instructor and she was then reassigned to another course, while a white teacher was assigned to teach ABT;

In the spring of 1987, Plance referred to Hull in a racially derogatory manner and said the district would get rid of her;

In the last five days of school in 1987, Schuck made Hull take leave without pay for her absence and did not give her the opportunity to make up and receive pay for the missed day;

Schuck recommended that the Board not renew Hull's teaching contract for the 1987–88 school year.

Hull alleged that defendants Plance, Schuck and Romes were carrying out the custom and policy of defendant Board and that these acts induced the Board not to renew her contract.

On March 20, 1990, the district court granted defendants' motion for summary judgment on each of plaintiff's claims. Plaintiff timely filed this appeal.

### II.

■ Plaintiff argues that the district court erred in granting defendants' motion for summary judgment on the § 1981 claims, because her termination was motivated by race and interfered with her right "to make and enforce contracts."

The district court held that the Supreme Court's recent decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) barred plaintiff's § 1981 claims. Section 1981 protects the rights of all persons, regardless of race, "to make and enforce contracts." In *Patterson*, the Court limited the scope of § 1981 to the formation of a contract and held that the statute did not apply to breach of the terms of the contract or imposition of discriminatory working conditions. *Id.* 109 S.Ct. at 2376–77. Although *Patterson* did not specifically address the issue of whether § 1981 applied to claims of discriminatory discharge, the majority of the circuit courts have held that claims of discriminatory discharge are no longer cognizable under § 1981, because discharge does not involve contract formation. *Lavender v. V & B Transmissions & Auto Repair*, 897 F.2d 805, 808 (5th Cir.1990) (because contract already was established, termination amounted to postformation conduct not actionable under § 1981); *Courtney v. Canyon Television & Appliance Rental, Inc.*, 899 F.2d 845, 849 (9th Cir.1990) (only refusal to hire on basis of

---

1. Hull's motion to dismiss the Board members in their personal capacities was granted by the district court on May 5, 1990.

race is actionable under § 1981; discharge is the type of postformation "breach of contract" conduct not protected by § 1981); *Carroll v. General Accident Insurance Co. of America,* 891 F.2d 1174, 1177 (5th Cir.1990) (claim of "constructive discharge" involves terms and conditions of employment which are not cognizable under § 1981); *Overby v. Chevron U.S.A., Inc.,* 884 F.2d 470, 473 (9th Cir.1989) (retaliatory discharge claim is postformation conduct not cognizable under § 1981). This court has recently adopted the majority's position and also determined that *Patterson* should be applied retroactively. *Prather v. Dayton Power & Light Co.,* 918 F.2d 1255, 1258 (6th Cir.1990).

Plaintiff attempts to avoid the impact of *Patterson* by arguing that her contract was "non-renewed" under Ohio Rev.Code § 3319.11 [2] rather than terminated and that the non-renewal impeded her from entering into a new contract with defendants. We find no merit in this argument. *Patterson* makes clear that in the context of promotions, a change in the employment relationship is critical before an act constitutes "contract formation conduct." The Court stated, "Only where the promotion rises to the level of an opportunity for a *new and distinct* relation between the employee and employer is such a claim actionable under § 1981." 109 S.Ct. at 2377 (emphasis added). In the present case, the automatic renewal of plaintiff's contract would not have risen to the level of a new and distinct employment relationship; therefore, non-renewal under § 3319.11, which is necessary to override the automatic renewal provision of a limited contract and to terminate employment, does not involve contract formation activity. For these reasons, we hold that non-renewal of a contract under Ohio Rev.Code § 3319.11 does not impede plaintiff's right to "make or enforce" contracts and is not cognizable under § 1981.

**2.** Ohio Rev.Code § 3319.11(E) provides in relevant part:

Any teacher employed under a limited contract ... is, at the expiration of such limited contract, deemed re-employed under the provisions of this division at the same salary plus any increment provided by the salary schedule unless ... the employing board, acting

### III.

Plaintiff next argues that the district court erred in granting defendants' motion for summary judgment on the 1985(3) claim.

To sustain a cause of action under 42 U.S.C. § 1985(3), a plaintiff must prove the existence of a conspiracy among "two or more persons." Plaintiff alleges that district superintendent Schuck, executive director Plance, and vocational supervisor Romes conspired together to deprive her of her constitutional rights. Defendants argue that the "intra-corporate conspiracy" theory bars this claim. The theory states:

It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.

*Nelson Radio & Supply Co., Inc. v. Motorola, Inc.,* 200 F.2d 911, 914 (5th Cir.1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953).

We agree with defendants. This court has adopted the general rule in civil conspiracy cases that a corporation cannot conspire with its own agents or employees. *Doherty v. American Motors Corp.,* 728 F.2d 334, 339 (6th Cir.1984). Although the doctrine was first developed in the context of antitrust litigation, this court in *Doherty* stated, "[T]he same rule has been consistently applied in allegations of conspiracy under the Civil Rights Act." *Id.* This court in *Doherty* agreed with a second circuit decision, *Herrmann v. Moore,* 576 F.2d 453 (2nd Cir.1978), which applied the "intra-corporate conspiracy" doctrine to bar the plaintiff's § 1985(2) claim. In *Herrmann,* the plaintiff had alleged a con-

upon the superintendent's written recommendation that the teacher not be reemployed, gives such teacher written notice.... [Such teacher] is presumed to have accepted such employment unless he notifies the board in writing to the contrary ... and a written contract for the succeeding school year shall be executed accordingly.

spiracy between an educational corporation, the Brooklyn Law School, and its trustees and employees. In the present case, plaintiff is alleging a conspiracy between a school district superintendent, the executive director of the district, and a school administrator, all of whom are employees or agents of the Board. Since all of the defendants are members of the same collective entity, there are not two separate "people" to form a conspiracy. We believe that this court's opinion in *Doherty* is dispositive of this issue. The district court's grant of defendants' motion for summary judgment on the § 1985(3) claim is hereby affirmed on this ground.

## IV.

■ In regard to plaintiff's § 1983 claims, alleging that she had been deprived of the right to racially non-discriminatory employment, this court must first address the issue to what extent these claims are barred by the applicable statute of limitations. This action was filed on April 5, 1989. Hull learned of the impending non-renewal of her teaching contract on April 5, 1987. Defendants contend that all other alleged discriminatory acts, including teaching assignments, performance evaluations, working conditions and employment benefits occurred before April 1987 and are time-barred by the applicable state limitations period for § 1983 claims, which in the present case is Ohio's two-year statute of limitations for actions involving bodily injury or injury to personal property. Ohio Rev.Code Ann. § 2305.10 (Anderson 1981 & Supp.1988).

Plaintiff asks this court to reconsider its unanimous en banc decision in *Browning v. Pendleton*, 869 F.2d 989, 990 (6th Cir.1989), in which the court held that in Ohio § 2305.10 governs actions under 42 U.S.C.

§ 1983. Plaintiff contends that the four-year statute of limitations found in § 2305.09 is more appropriate. In the alternative, plaintiff argues that despite the limitations period, all of plaintiff's claims are timely because they are part of a "continuing pattern" of discriminatory conduct.

We believe plaintiff's request to reconsider a unanimous en banc decision of this court should be declined.[3] As this court in *Browning* stated, the applicable state limitations period for § 1983 claims is the two-year limitations period for actions involving bodily injury or injury to personal property found in Ohio Revised Code Ann. § 2305.10.

■ However, we believe plaintiff's "continuing violation" theory has merit. This theory was first articulated by the Supreme Court in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). In *Havens*, plaintiffs brought suit under § 804 of the Fair Housing Act, 42 U.S.C. § 3604, alleging that the defendants engaged in "racial steering." Although four of the five incidents alleged in the complaint occurred outside the 180-day limitations period set forth in the statute, the Supreme Court, nevertheless, ruled that all of the incidents were actionable under a "continuing violation" theory. *Id.* at 380–81, 102 S.Ct. at 1125.

As the Court observed, "Plainly the claims ... are based not solely on isolated incidents involving the two respondents, but a continuing violation manifested in a number of incidents—including at least one ... that is asserted to have occurred within the 180–day period." *Id.* at 381, 102 S.Ct. at 1125. Accordingly, the Court held that "where a plaintiff ... challenges not just one incident of [unlawful] conduct ... but an unlawful practice that continues into the limitations period, the complaint is timely

---

**3.** In regard to plaintiff's argument that § 2305.09(D) should apply because it governs actions for *intentional* infliction of emotional distress, the Supreme Court has expressly held that § 1983 actions should *not* be analogized to intentional torts:

> Petitioners' argument that courts should borrow the intentional tort limitations periods because intentional torts are most analogous

to § 1983 claims fails to recognize the enormous practical difficulties of such a selection. Moreover, this analogy is too imprecise to justify such a result.

*Owens v. Okure*, 488 U.S. 235, 109 S.Ct. 573, 580, 102 L.Ed.2d 594 (1989). Instead the state's general or residual statute of limitations governing personal injury actions should be applied. *Id.*

when it is filed within 180 days of the last asserted occurrence of that practice." *Id.* (footnote omitted).

In *Held v. Gulf Oil Co.,* 684 F.2d 427 (6th Cir.1982), this court applied the "continuing violation" theory in a Title VII sex discrimination case, which culminated in a constructive discharge. The court in *Held* found that discriminatory acts made by the employer and various employees occurred throughout the term of plaintiff's employment and stated:

> [I]f the discriminatory acts commenced prior to the 180 day period and there was a continuous pattern of discrimination that continued into the 180 day period, plaintiff may still maintain her action [on all the claims] even though single discriminatory acts prior to the 180 days period are barred.

*Id.* at 430. If subsequent identifiable acts of discrimination occurred within the critical time period and were related to the time-barred incident, the bar does not apply. *Id.*

In the present case, as in *Held,* plaintiff alleges discriminatory working conditions throughout the term of her employment, which were related to her discharge. In *Conlin v. Blanchard,* 890 F.2d 811, 815 (6th Cir.1989), this court stated that a court should determine what event "should have alerted the average lay person to protect his rights." In the present case, we believe that prior to the events surrounding plaintiff's discharge, plaintiff was not warranted in filing a race discrimination suit.

Defendants rely on *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) for the proposition that unless a plaintiff can demonstrate that a series of discriminatory acts are part of one ongoing plan or scheme, "[a] discriminatory act which is not made the basis for a timely charge" may constitute relevant background of a current practice, but separately considered, is merely "an unfortunate event in history which has no present legal consequences." *Id.* at 558, 97 S.Ct. at 1889.

This court has specifically rejected a broad reading of this language in *Evans* (which concerned the impact of a seniority system on a pregnant woman who was fired and then rehired). "We regard *Evans* as a narrow case, which should be limited to instances of past discrimination perpetuated by bona-fide seniority systems." *Roberts v. North American Rockwell Corp.,* 650 F.2d 823, 827 (6th Cir.1981). In *Rockwell,* this court found that *Evans* did not apply to a discriminatory hiring case. We believe that similarly it is inappropriate to apply *Evans* in the present case alleging racially discriminatory treatment in employment and discharge. As this court in *Rockwell* stated, there are important policy reasons not to require that a discrimination suit be filed at the first instance of discrimination or not at all. To do so, would frustrate the broad remedial purposes of civil rights laws which encourage the eradication of discrimination. *Id.*

For these reasons, we believe the district court erred in applying the two-year statute of limitations to all but plaintiff's discriminatory discharge claims.

## V.

We will next address the merits of whether the district court erred in granting defendants' motion for summary judgment on the § 1983 claims against defendants Schuck, Plance and Romes in their official and personal capacities.

### A. Qualified Immunity

To establish the personal liability of defendants Schuck, Plance and Romes under 42 U.S.C. § 1983, plaintiff must show that they deprived her of a federal right while acting under color of state law. *Wagner v. Metropolitan Nashville Airport Auth.,* 772 F.2d 227, 229 (6th Cir. 1985). Plaintiff alleged that defendants violated her 14th amendment rights to due process and equal protection by intentionally discriminating against her on the basis of race.

Defendants Schuck, Plance and Romes moved for summary judgment on the ground of qualified immunity. Qualified immunity protects a public official from

personal liability for civil damages insofar as his or her conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

When the issue of qualified immunity is raised, "the plaintiff is obliged to present facts which if true would constitute a violation of clearly established law." *Dominque v. Telb,* 831 F.2d 673, 677 (6th Cir. 1987) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985)). With respect to summary judgment motions on qualified immunity grounds, this court has held:

> Where, as here, discovery has taken place and the defendant officials have moved for summary judgment on the basis of qualified immunity, we believe the plaintiff must present direct evidence that the officials' actions were improperly motivated in order to have any hope of defeating the motion. The plaintiff, "to avert dismissal short of trial, must come forward with something more than inferential or circumstantial support for [her] allegation of unconstitutional motive."

*Poe v. Haydon,* 853 F.2d 418, 432 (6th Cir.1988) (citations omitted), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989).

In the present case, the district court stated that *Poe* "established the quantum of proof necessary to overcome a motion for summary judgment based on qualified immunity in an unconstitutional motive case."

> Plaintiff argues that the holding in *Poe* is limited by this court's subsequent decision in *Crutcher v. Kentucky,* 883 F.2d 502, 504 (6th Cir.1989), and that the district court improperly set too high a standard of proof to overcome a motion for summary judgment on the ground of qualified immunity by not allowing plaintiff to draw inferences from circumstantial evidence in proving her case. We agree. In *Crutcher,* this court stated: It is true that *Poe* states that "the plaintiff must present direct evidence that the

officials' actions were improperly motivated in order to" resist a qualified immunity summary judgment motion. This does not mean that [the plaintiff] must bring in an admission from the lips of her defendant. She may rely on proof that would be strong enough to allow a jury to return a verdict for her under appropriate instructions, and it is clear that the law allows victims of race discrimination, as in other cases, to prove their cases by inferential and circumstantial proof. *To the extent that [appellant] reads Poe to set a higher standard for qualified immunity than applies on the merits, he is wrong.*

*Id.* at 504 (citation omitted) (emphasis added).

Thus, the question presented on this appeal concerning the § 1983 claims is whether plaintiff has presented sufficient probative evidence that would be strong enough to allow a jury to return a verdict for her.

## B. Defendant Schuck

■ Defendant Schuck moved for summary judgment on the ground that his recommendation that plaintiff's contract not be renewed was not racially motivated. He stated in an affidavit that "the decision not to reappoint Ms. Hull was made solely because the program in which she worked, word processing specialist, was eliminated for the 1987–88 school year."

Plaintiff alleges that Schuck's racial animus may be inferred from the following. After receiving a poor evaluation for her ABT course by defendant Romes, plaintiff was reassigned by Schuck and Plance to word processing enrichment even though the teacher hired to teach ABT withdrew and courses were rearranged so that a white male could teach ABT. Plaintiff provides no evidence that Schuck and Plance, who did not make the ABT evaluation, used the poor evaluation as a pretext to keep plaintiff from teaching ABT.

■ Plaintiff also contends that a white teacher, who took a day off in the last five days of the school year, was afforded the opportunity to make up and receive pay for the lost time and plaintiff was not. Plain-

tiff has not demonstrated that she and the white teacher were similarly situated, particularly in view of the fact that plaintiff's employment terminated at the end of the school year. *See Shah v. General Electric Co.*, 816 F.2d 264, 270 (6th Cir.1987) ("absent proof that the other employees were similarly situated, it is not possible to raise an inference of discrimination").

■ Plaintiff also argues that during her meeting with Schuck on April 5, 1987, Schuck did not tell her that the word processing program was being eliminated, but instead indicated that she "had not found a good match" with the district, that she "did not fit in," that her questions made him uncomfortable, and that he could not say more for legal reasons. Plaintiff also alleges that Schuck may not have been telling the truth in his affidavit, because the minutes of the Board of Education's April 15, 1987 meeting indicated that an "enrichment" position was open for the following year. Plaintiff's prior position with the school was to teach the word processing "enrichment" course.

Defendant Schuck contends that the "enrichment" position referred to in the minutes of the April 15, 1987 meeting was a computer graphics "enrichment" course. However, there is no evidence to support this contention in the record.

If the inferences drawn from Schuck's failure to tell plaintiff the specific reason why her contract was not being renewed and the continuation of an "enrichment" position are construed in a light most favorable to plaintiff, they present evidence which is sufficient to cast doubt on Schuck's purported reason for non-renewal and create a genuine issue of material fact about the reason Schuck made the recommendation. Although we believe the remarks made by defendant Schuck to Hull during the April 5, 1987 meeting are racially neutral and alone are not sufficient probative evidence of discriminatory intent, we believe it would be proper to grant summary judgment to defendant Schuck only after it were conclusively determined that plaintiff's position was not continued. For this reason, the district court erred in granting defendant Schuck's motion for summary judgment on the § 1983 claim before this issue was resolved.

## C. Defendant Plance

Plaintiff argues that the deposition of William Jones, another teacher at Cuyahoga Valley, establishes that defendant Plance stated in the presence of William Jones in the school lounge somewhere between January and June of 1987 that plaintiff and another black faculty member were "a couple of dumb niggers" and the district was "going to get rid of them." Plaintiff contends that this racial slur made by Plance is evidence of his racial animus and unconstitutional motive in recommending that she not be rehired.

The district court characterized Jones' deposition testimony as insubstantial and insignificant, because Jones was hesitant about stating with certainty that a racial slur had been made or who had made it. In his deposition, Jones stated that at one time he believed the statement had been made, but three years had passed and he had come to have doubts about whether the statement was made and could no longer recall exactly what was said or who said it.

However, Jones' deposition also reveals the following:

Jones conceded that he had told Paul Brown, another teacher at the school and union official, that Plance had referred to plaintiff and another black woman in a racaially derogatory manner and that he "would like to get rid of them" or "they were going to get rid of them."

Jones told Rich Bradley, an electronics teacher and another union official, the same thing about the remark Plance made.

Jones told Mrs. Washington, a black administrator at the school, that Plance had referred to her and plaintiff in a racially derogatory manner.

Jones stated that he came away from the conversation with Plance with the belief that the racially derogatory word was used because "he was shocked that Dr. Plance would use that word."

After being told by Paul Brown that plaintiff was thinking about subpoenaing him, Jones stated that he would have to testify that he believed the statement was made, although he would prefer not to.

Recently, Jones had talked with the attorney for the defendants [Helen] for several hours in Dr. Plance's office. Jones testified:

> After talking with Helen, it was like— she pointed out to me—she made me think what was truth and what was speculation, and was I sure, and *I told her I was positive something was said,* but when I went home to think about it, I was not sure—you know, I was really confused, and I'm not sure it was even made now. I shouldn't say that. I'm not positive of what was said, or when it was made (emphasis added).

Jones did not know whether to trust the school lawyer or to trust plaintiff's lawyer and he didn't want to be saying things he shouldn't be saying.

Jones ended his testimony about the alleged racial slur with the following statement:

> *I have feelings I believe the statement was made,* but after talking to Helen, I had to sit down and say, "What is the truth? What do you believe?" And from the truth, you know, I want to say I don't know what the truth is at this point in time (emphasis added).

When construed in a light most favorable to plaintiff, it can reasonably be inferred from Jones' deposition testimony that he told three other people about the racial slur Dr. Plance made during their conversation and that it was only after talking to defendants' lawyer that he began to equivocate because he was fearful of saying the wrong thing. The district court applied an incorrect standard in dismissing Jones' deposition testimony as insignificant and insubstantial. Rather than

drawing all inferences from the evidence provided by Jones in favor of plaintiff, the district court weighed the evidence and determined that Jones was not a credible witness. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). It is clear that in reaching the conclusions that it did, the district court veered from this standard.

However, even if it were determined from Jones' testimony that Plance made a racially derogatory remark, there is still a question of whether an isolated remark represents a sufficiency of direct evidence to raise a question of material fact regarding the motivation of defendant Plance in recommending that plaintiff's contract be non-renewed.[4] Although isolated remarks made by non-decisionmakers, *Chappell v. GTE Products Corp.,* 803 F.2d 261, 268 n. 2 (6th Cir.1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987), or a blatantly discriminatory remark that may be perceived as a joke, *Gagne v. Northwestern National Insurance Co.,* 881 F.2d 309, 314 (6th Cir.1989), are not sufficient evidence of discriminatory motive, Plance's remark was made by a decisionmaker and cannot be construed as a joke. His use of the word "niggers" cannot be characterized as harmless or casual. The court in *McKnight v. General Motors Corp.,* 908 F.2d 104, 114 (7th Cir.1990) stated that the use of this word, even in jest, could be evidence of racial antipathy. *See also Bailey v. Binyon,* 583 F.Supp. 923, 930 (N.D.Ill.1984) (malicious nature of this racially derogatory word reflects hostility and racial animus); *Cardona v. Skinner,* 729 F.Supp. 193, 199 (D.Puerto Rico 1990) (racial slur is probative on the issue of motive). In the present case, we believe

---

4. Defendant Plance stated in his deposition that, generally speaking, he made teaching assignment decisions, but that Schuck always held veto power. Defendant Schuck stated that evaluations for renewal and non-renewal of teach-

ing contracts were done at the supervisor level and then reviewed at the executive director level and then the executive director would review the decision with him.

that the use of the racially derogatory word in juxtaposition with Plance's statement that he wanted to get rid of two of the three black employees employed at the school, if true, is evidence of racial animus. For these reasons, we believe a question of material fact regarding the motivation of defendant Plance was raised and it was error for the district court to grant him summary judgment on the § 1983 claim.[5]

## D. Defendant Romes

 Defendant Romes argues that plaintiff has produced no probative evidence that his evaluation of her ABT performance was racially motivated. We agree. Plaintiff has introduced no probative evidence that Romes' evaluation was discriminatory, but merely conclusively asserts that in her opinion the evaluation did not sufficiently take into account classroom conditions. *See Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir. 1982) (plaintiff's "personal conclusions" are insufficient to establish discrimination). Moreover, although Romes downgraded plaintiff for low student morale and group control, he stated that the classroom conditions "may be cause of loose group control."

 Although Romes excused a white teacher from cafeteria duty to conduct school-related business and he did not excuse plaintiff from cafeteria duty so that she could continue an in-service seminar, plaintiff has not demonstrated that she and the white teacher were similarly situated.

Romes did not participate in the non-renewal decision and his evaluation of her in another course a year earlier is too tenuous a link in the decision not to rehire her. For these reasons, the district court's grant of summary judgment on the § 1983 claim to defendant Romes is hereby affirmed.

## VI.

Finally this court must determine whether the district court erred in granting de-fendants' motion for summary judgment on the § 1983 claim against the Board.

 A municipality may be held liable under § 1983 only for official policies or customs. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 128, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988). Plaintiff argues that under *Pembaur v. Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986), the Board may be held liable for the single discriminatory act of an authorized decisionmaker, and that it was error for the district court to require a long-standing and ongoing discriminatory practice on the part of the Board.

Plaintiff misconstrues *Pembaur.* Under *Pembaur,* an "official policy" is one adopted by someone with "final authority *to establish municipal policy* with respect to the action ordered." *Id.* (emphasis added). Further:

> [O]nly those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability.

*Praprotnik,* 485 U.S. at 123, 108 S.Ct. at 924. The question of final policymaking authority is one "of *state law.*" *Id.* Section 3319.11 of the Ohio Revised Code states that a board of education has final authority to establish employment policy and make renewal and non-renewal decisions. *Justus v. Brown,* 42 Ohio St.2d 53, 58, 325 N.E.2d 884 (1975).

Plaintiff's argument that Schuck exercises final authority, because the Board allegedly "rubber-stamps" his recommendations is contrary to *Paprotnik's* explicit warning not to look beyond where "applicable law purports" to vest power. 485 U.S. at 126, 108 S.Ct. at 925. Moreover, the Court's illustration in *Pembaur* demonstrates how narrowly "final policymaker" is defined:

> [F]or example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county em-

---

**5.** Plaintiff also alleges that Plance's two refusals to reassign plaintiff to regular classroom teaching were racially motivated. However, plaintiff has not demonstrated that similarly situated white teachers were treated differently. Plaintiff does not allege that white teachers are reassigned on demand.

ployment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability.... Instead, if county employment policy was set by the Board of County Commissioners, only that body's decision would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. 475 U.S. at 483 n. 12, 106 S.Ct. at 1300 n. 12. We believe that Schuck's position is similar to that of the county sheriff, who was given as an example of one who is not a final decisionmaker in *Pembaur.* Thus, even if Schuck exercised his discretion to terminate plaintiff in an unconstitutional manner, this is not a decision of the Board. Under Ohio law, Schuck is not responsible for establishing final policy with respect to the renewal and non-renewal of employment contracts. There is no question that Plance and Romes are not "final policymakers." Thus, in the present case, the Board is not liable under § 1983 unless plaintiff can prove the existence of discrimination by the members of the Board.

Plaintiff contends that the Board members knew Schuck's recommendation was racially motivated and knowingly ratified a discriminatory act, thereby converting discrimination into an official Board policy. There is no evidence to support plaintiff's claim that the Board members knew Schuck's recommendation was allegedly discriminatory. To the contrary, plaintiff acknowledges that she never initiated the subject of race in her conversations with the Board members whom she contacted. Of the two who raised the subject on their own, one expressly said he did *not* believe racism was involved, and one indicated he would look into the possibility of racial discrimination to satisfy himself that race was not involved. The fact that he voted in favor of non-renewal is not probative evidence that the Board knowingly ratified an unconstitutional act. Because plaintiff has failed to provide proof of an official Board policy or that the Board ratified Schuck's and Plance's allegedly racially discriminatory acts, the district court's grant of summary judgment to the Board on the § 1983 claim is hereby affirmed.

## VII.

The decision of the district court is affirmed in part and reversed in part. The grant of defendants' motion for summary judgment on the § 1981 and § 1985(3) claims is AFFIRMED. The grant of summary judgment on the § 1983 claims to defendants Cuyahoga Valley Joint Vocational School District Board of Education and Gary Romes is AFFIRMED. The grant of summary judgment on the § 1983 claims to defendants Schuck and Plance is REVERSED. The case is REMANDED to the district court for proceedings consistent with this opinion.