Sharyn STAGI, et al., Plaintiffs,

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, Defendant.**

No. 03–CV–5702.

United States District Court, E.D. Pennsylvania.

Dec. 30, 2005.

---

Alan M. Sandals, Scott M. Lempert, Sandals & Associates PC, Philadelphia, PA, Timothy M. Kolman, Ari Risson Karpf, Timothy M. Kolman and Associates, Langhorne, PA, for Plaintiffs.

William J. Delany, Morgan Lewis and Bockius LLP, Philadelphia, PA, for Defendant.

### *MEMORANDUM AND ORDER*

ANITA B. BRODY, District Judge.

## I.  INTRODUCTION

In this disparate impact case under Title VII of the Civil Rights Act of 1964, female employees of the National Passenger Railroad Corporation, better known as Amtrak, allege that a certain Amtrak employment policy resulted in a disproportionately low number of women in management positions.

Currently before me is Defendant's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), or in the alternative, for summary judgment. For the reasons set forth below, I will deny Defendant's motion for judgment on the pleadings. At this early stage of the litigation, I decline Defendant's invitation to treat this motion as one for summary judgment.

## II.  FACTUAL BACKGROUND[1]

Defendant Amtrak is a corporation created by the Rail Passenger Service Act of 1970, 45 U.S.C. § 501 *et seq.* (Am.Compl. ¶ 9.) The U.S. government subsidizes Amtrak and holds 100 percent of its stock. (*Id.* ¶ 11.) Amtrak provides passenger rail service across the United States and currently employs approximately 22,000 workers. (*Id.* ¶¶ 13, 16.) Amtrak employs both union and non-union employees. (*Id.* ¶¶ 20, 21.) From 2001 to 2002, Amtrak underwent a corporate restructuring, which involved a reduction in the size of its workforce through layoffs. (*Id.* ¶ 29.)

Plaintiff Sharyn Stagi began working for Amtrak in 1973 as an "agreement-covered" (i.e. union) employee, in the capacity of R & I clerk. (*Id.* ¶ 20.) She was later promoted to Inventory Control Planner and later to System Analyst—a non-union, management position. (*Id.* ¶ 21.) Stagi continued in this position until April of 2002, when she was laid off. (*Id.* ¶ 22.) Plaintiff Winifred Ladd also began working for Amtrak in 1973 in the agreement-covered (union) position of R & I clerk. (*Id.* ¶ 23.) She was later promoted to clerk typist and eventually rose to the nonunion, management position of Operation Support Specialist. (*Id.* ¶ 24.) Ladd continued in this position until April of 2002, when she was laid off. (*Id.* ¶ 25.)

Following their layoffs in 2002, because both Stagi and Ladd had previously held union positions and continued to be union members, they had the opportunity to "bump-down," or bid for union positions with lower pay and benefits. (*Id.* ¶¶ 26, 37, 45.) Stagi and Ladd both took this opportunity to "bump-down" to union positions. (*Id.*)

---

1.  In deciding a motion for judgment on the pleadings, as with a motion to dismiss, I must accept as true the well-pleaded allegations of the complaint and draw all reasonable inferences in the Plaintiffs' favor. *Oran v. Stafford*, 226 F.3d 275, 279 (3d Cir.2000).

Amtrak has a policy of trying to fill management positions via internal promotion. (*Id.* ¶ 33.) Prior to the 2002 layoffs, in 2000, Amtrak had promulgated an employment policy known as PERS–4 which provided:

A non-agreement covered employee may not apply for a posted non-agreement covered position if he or she has not been in his or her current position for at least one year. An agreement covered employee may not apply for a posted non-agreement covered position unless he or she has been in his or her current union for one year.

(*Id.* ¶ 27.) Amtrak applies the prohibitions of PERS–4 not only to union employees who have not been in their union for at least one year, but to union employees who have not been in their current union positions for at least one year. (*Id.* ¶ 28.)

A majority of the management-level employees affected by the 2002 layoffs were female, due to their lower seniority and pay grades. (*Id.* ¶ 30.) A majority of laid-off management-level employees who bumped-down to union positions following the 2002 layoffs were female. (*Id.*) As certain management positions became available at Amtrak in the year following the 2002 layoffs, these female employees were barred by PERS–4 from applying for and filling these management positions. (*Id.* ¶ 31.) The management-level employees who had been able to avoid "bumping down" following the 2002 layoffs because of their higher seniority or pay grade, a majority of whom were male, were not barred by PERS–4 from applying for and filling management positions in the year following the layoffs. (*Id.* ¶ 32.) Several of the management positions to which certain female employees were barred from applying by PERS–4 were subsequently filled by males. (*Id.* ¶ 35.)

Plaintiff Stagi applied for three management-level positions during the year after her layoff in 2002, one of which was inventory control planner, a position she had previously held at Amtrak. (*Id.* ¶¶ 38, 42–43.) Stagi was notified that she could not be considered for these positions under PERS–4, as she had not yet been in her current union position for one year. (*Id.* ¶ 42–43.) Plaintiff Ladd applied for a management-level position as a scheduling officer during the year after her layoff in 2002. (*Id.* ¶ 46.) Like Stagi, Ladd was not allowed to compete for this position under PERS–4, as she had not yet been in her current union position for one year. (*Id.* ¶ 47.)

Plaintiffs satisfied the exhaustion requirements of Title VII by bringing timely charges of discrimination with the EEOC. (*Id.* ¶ 18.) Plaintiffs then timely filed this suit on behalf of themselves and all others similarly situated,[2] alleging disparate impact under Title VII and violations of the Fifth Amendment to the United States Constitution.

## III. LEGAL STANDARD

In deciding a motion for judgment on the pleadings, as with a motion to dismiss, I must view the facts alleged in the pleadings and the inferences to be drawn from those facts in the light most favorable to the Plaintiffs. *Mele v. Fed. Reserve Bank of New York*, 359 F.3d 251, 253 (3d Cir. 2004); *Shelly v. Johns–Manville Corp.*, 798 F.2d 93, 97 n. 4 (3d Cir.1986). That is, I must accept as true the well-pleaded allegations of the complaint and draw all

---

**2.** Plaintiffs filed this suit as a class action, but seek precertification discovery before moving for class certification. In an Order of June 24, 2005, I denied Plaintiff's Motion for Pre- certification Class Discovery without prejudice to reassert after my disposition of Defendant's Motion for Judgment on the Pleadings.

reasonable inferences in the Plaintiffs' favor. *Oran v. Stafford,* 226 F.3d 275, 279 (3d Cir.2000). The motion should not be granted unless the moving party has established that there is no material issue of fact to resolve, and that it is entitled to judgment as a matter of law. *Mele,* 359 F.3d at 253. The moving party must show that "no relief could be granted under any set of facts that could be proved." *Wolf v. Ashcroft,* 297 F.3d 305, 307 (3d Cir.2002).

## IV. DISCUSSION

Plaintiffs' Amended Complaint asserts disparate impact in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count I), and violations of the Fifth Amendment to the United States Constitution (Count II). Defendant's motion addresses itself solely to the Title VII claim which comprises Count I, and accordingly I do not discuss Count II.

Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, allows plaintiffs to prevail on a claim of employment discrimination under the theory of disparate impact. *See* 42 U.S.C. § 2000e–2(k); *Griggs v. Duke Power Co.,* 401 U.S. 424, 430–31, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 987–88, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). In *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the Supreme Court held that the Title VII disparate impact theory is applicable to claims of gender disparity caused by facially neutral employment policies. To prevail on a disparate impact claim, a plaintiff must first establish a prima facie case by "demonstrating that application of a facially neutral standard has resulted in a significantly discriminatory hiring pattern." *Lanning v. SEPTA,* 181 F.3d 478, 485 (3d Cir.1999) (citing *Dothard,* 433 U.S. at 329, 97 S.Ct. 2720). "Once the plaintiffs have established a prima facie case, the burden shifts to the employer to show that the employment practice is 'job related for the position in question and consistent with business necessity.'" *Lanning,* 181 F.3d at 485 (quoting 42 U.S.C. § 2000e–2(k)). "Should the employer meet this burden, the plaintiffs may still prevail if they can show that an alternative employment practice has a less disparate impact and would also serve the employer's legitimate business interest." *Id.*

Amtrak does not assert that it is entitled, at this stage of the litigation, to judgment as a matter of law with respect to any "business necessity" defense. Nor has Amtrak argued that it is immune from liability under § 703(h) of the Civil Rights Act, relating to bona fide seniority systems.[3] Thus, to succeed on its motion for judgment on the pleadings, Amtrak must show that the Plaintiffs have failed to make out their prima facie case of disparate impact. Amtrak raises several arguments for why Plaintiffs' disparate impact claim must fail as a matter of law, all of which boil down to a single contention: that the ultimate cause of the harm Plaintiffs allege was the admittedly lawful, seniority-based 2002 layoffs that had a disproportionate effect on female employees. Yet because this contention goes to the reason *why* PERS-4 had a disproportionate effect on female Amtrak employees, rather than *whether* it did or not, Defendant's argument is ultimately irrelevant to

---

3. Section 703(h) provides, in part: "[I]t shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system ... provided that such differences are not the result of an intention to discriminate...." 42 U.S.C. § 2000e–2(h).

whether Plaintiffs have adequately stated a prima facie case of disparate impact. Accepting all of Plaintiffs' well-pleaded allegations as true and granting them the benefit of every reasonable inference, Plaintiffs have met their threshold burden of alleging that the application of PERS–4 resulted in a significant gender disparity in management positions at Amtrak. Thus, Defendant's motion must be denied.

## A. Causation

In making out a prima facie case of disparate impact, the plaintiff's burden "goes beyond the need to show that there are statistical disparities in the employer's work force." *Watson*, 487 U.S. at 994, 108 S.Ct. 2777. Rather,

> [t]he plaintiff must begin by identifying the specific employment practice that is challenged. . . . Once the employment practice at issue has been identified, causation must be proved; that is the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.

*Id.* Thus, to survive Defendant's motion for judgment on the pleadings, the Plaintiffs' complaint must identify a specific employment practice that caused the gender disparity in management positions that is the basis of the Plaintiffs' claim. *See Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 641–42 (3d Cir.1993). The Plaintiffs' complaint and response to Defendant's motion clearly identify the "specific employment practice" challenged in this lawsuit as Amtrak's promulgation and enforcement of PERS–4: "[P]laintiffs properly limit their claim to the disparate impact on female union employees resulting from the promulgation and application of the union employee blocking rule." (Pls.' Mem. Opp. Def.'s Mot. J. Pleadings at 9–10.)

Plaintiffs must also allege that the challenged employment practice was the cause of the disparate impact. Defendant argues that the face of Plaintiffs' complaint shows that the true cause of the harm Plaintiffs allege was not the one-year requirement of PERS–4, but the 2002 layoffs. Defendant contends that the reason that Amtrak's PERS–4 policy disproportionately affected women following the 2002 layoffs was the fact that the layoffs themselves disproportionately affected women.[4] Defendant asserts, correctly, that Plaintiffs do not allege that the 2002 layoffs violated Title VII.[5] Thus, Defendant reasons, because the 2002 layoffs did not violate Title VII, and the layoffs are the reason for the disproportionate effect PERS–4 had on female employees, Plaintiffs cannot make out a prima facie case of disparate impact with respect to PERS–4.

However, Defendant mischaracterizes the Title VII disparate impact theory and the degree of causation a plaintiff is required to allege to make out a prima facie case. The Third Circuit has cautioned courts not to be "overly demanding in the proof required for a prima facie case" under Title VII. *Jackson v. U.S. Steel Corp.*,

---

4. Plaintiffs do not bring a disparate impact claim based on the 2002 layoffs. Defendant characterizes Plaintiffs' claims as a "backdoor attempt to litigate the effects of the reorganization" because the statute of limitations has run or they failed to exhaust this claim. (Def.'s Mem. Supp. Mot. J. Pleadings at 12.) However, this is irrelevant—what is before me is a present state of affairs that might have been impacted by prior actions of the Defendant.

5. The 2002 layoffs were probably perfectly proper. They appear to have been done on the basis of seniority, which is an absolute defense to disparate impact liability under § 703(h) of the 1964 Civil Rights Act.

624 F.2d 436, 440–41 (3d Cir.1980). Tellingly, the cases to have grappled with the question of whether an employment practice "caused" a disparate impact have involved chains of causation much more convoluted than the one at issue here. *See, e.g., EEOC v. Greyhound Lines, Inc.*, 635 F.2d 188 (3d Cir.1980) (no causation between employer's "no beard" policy and percentage of African–American employees, despite evidence of skin disorder primarily affecting black males that makes shaving painful); *City of Bayonne*, 134 F.3d at 121–25 (no causation between city police department's local residency requirement and percentage of African–American officers). Here, Plaintiffs' allegations of causation are relatively straightforward: (1) Amtrak's PERS–4 policy prevented union employees from applying for management positions unless they had been in their current union positions for a year; (2) during the relevant times, a majority of those who had been in their current union jobs for less than one year were women; and (3) as a result of Amtrak's application and enforcement of PERS–4, a significant number of management positions at Amtrak were denied to women and filled by men.

Giving Plaintiffs the benefit of every reasonable inference, it is clear that they have made out a prima facie case that PERS–4 caused the alleged gender disparity in management positions. First of all, Plaintiffs have certainly alleged that PERS–4 was a "but-for" cause of this disparity. If PERS–4 had not been in effect after the 2002 layoffs, or had not been enforced against Plaintiffs, they would presumably have had an equal opportunity to compete for management positions and would not be in court today. Moreover, Amtrak's promulgation and enforcement of PERS–4 and its 2002 round of layoffs were two separate, independent sets of events that cannot be viewed as one single "cause." Indeed, just as there could have been layoffs without PERS–4, there could have been a PERS–4 without layoffs.

The Plaintiffs do not dispute that the reason *why* PERS–4 allegedly disproportionately affected women is that the 2002 layoffs disproportionately affected women. However, this does not mean that the 2002 layoffs, and not PERS–4, "caused" the gender disparity that Plaintiffs allege. To help understand this rather elusive concept, it may be useful to draw an analogy to *Griggs*, the first Supreme Court case to recognize the disparate impact theory. There, the challenged employer practice was a high school diploma requirement for certain positions, which the plaintiffs claimed caused a disparate impact on African–Americans. *Griggs*, 401 U.S. at 427–28, 91 S.Ct. 849. However, the reasons *why* a diploma requirement disproportionately affected blacks were numerous: inferior and segregated education systems, socioeconomic disparities, and the entire ugly legacy of slavery in America. Without holding the defendant in *Griggs* responsible for these ultimate "causes," the Supreme Court found the defendant liable because its diploma requirement had the result of creating an unjustified racial disparity. To borrow a term of art from the law of torts, the diploma requirement was the "proximate cause" of the disparity.

In any disparate impact case, there are likely to be myriad reasons why a particular facially neutral employer practice or requirement disproportionately affects one group or another. The point is that the disparate impact theory does not look at these ultimate reasons for a disparity— and thus the existence of some ultimate cause for which the employer is not legally responsible cannot defeat a plaintiff's prima facie case.

Of course, this case is slightly complicated by the fact that the ultimate cause to which the Defendant points, the 2002 layoffs, was in itself perfectly lawful. Plaintiffs admittedly do not claim that the 2002 layoffs violated Title VII, and indeed, if they were conducted "pursuant to a bona fide seniority ... system" as the parties suggest, they are *per se* lawful under § 703(h) of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2(h).[6] However, Amtrak does not contend in its motion that PERS–4 is itself is a bona fide seniority system. Nor does Amtrak explicitly argue that its application of PERS–4 to the Plaintiffs should be insulated by the same absolute seniority defense that shields them from liability for the 2002 layoffs.[7] Yet if I were to hold that the seniority-based 2002 layoffs "caused" the alleged disparity in this case, I would be, in effect, extending the protections of 703(h) to Amtrak's promulgation and application of PERS–4.

If 703(h) could shield an employer from liability for any employment decisions whose effects were mediated by an earlier, seniority-based decision, then an employer could use any seniority-based decision having a disparate impact on a particular group to justify all future actions having a disparate impact on that group. For instance, imagine that an employer makes a particular training program available on the basis of seniority—which is perfectly within its rights under 703(h). Assume further that most of the employees with the seniority to be eligible for this training are men. Finally, assume that the employer makes this training a prerequisite for promotion to a new position—for which the training is *in no way a legitimate business requirement.* This hypothetical would create precisely the situation that

the disparate impact theory seeks to redress: the creation of "artificial, arbitrary, and unnecessary barriers to employment" that create disparities in the workplace on the basis of gender, race, or other impermissible classifications. *Griggs*, 401 U.S. at 431, 91 S.Ct. 849. Yet under Defendant's theory of the present case, the plaintiffs in this hypothetical could not bring a disparate impact claim because seniority was the ultimate "cause" of their being denied the training, and thus the position. Because this cannot be the law, and because Plaintiffs have made out a prima facie case of disparate impact under Title VII, I reject Defendant's argument and deny its motion for judgment on the pleadings.

**B.** *Present Effects of Past Discrimination*

■ Consistent with its belief that this case is really about the 2002 layoffs, Amtrak argues that Plaintiffs are merely trying to recover for the present effects of past discrimination, which is foreclosed by *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). According to Defendant, "Plaintiffs' allegation is that, when Amtrak applies the neutral and non-discriminatory one-year rule, they are now feeling the effects of that allegedly disparate impact from 2002." (Def.'s Mem. Supp. Mot. J. Pleadings at 8.) Defendant relies primarily on *Evans* for its argument that Plaintiffs' claim is based on the present effects of past discrimination. However, *Evans* is simply not this case. There was no claim in *Evans* of present disparate impact, nor could there have been, because the employer policy in question was clearly a bona fide seniority

---

6. *See supra* note 3.

7. *See California Brewers Ass'n v. Bryant*, 444 U.S. 598, 100 S.Ct. 814, 63 L.Ed.2d 55 (1980).

system shielded from disparate impact challenge by 703(h).

*Evans* involved a flight attendant who was terminated from her job when she married in 1968, pursuant to a United Airlines policy forbidding female (but not male) flight attendants to marry. 431 U.S. at 554, 97 S.Ct. 1885. The plaintiff took no legal action at the time of her discharge. *Id.* at 554–55, 97 S.Ct. 1885. Subsequently, the Seventh Circuit held the airline's policy to be disparate treatment on the basis of gender in violation of Title VII. *Id.* at 554, 97 S.Ct. 1885. United Airlines rehired the plaintiff in 1972, but pursuant to a facially neutral seniority system, it denied her seniority credit for the time that she had previously worked at the airline. *Id.* at 555–56, 97 S.Ct. 1885. The plaintiff filed suit. *Id.* at 556, 97 S.Ct. 1885. Although conceding that the statute of limitations barred her from litigating her 1968 termination under the "no marriage" policy, the plaintiff argued that United was committing a "continuing violation" of Title VII because: (1) the denial of seniority corresponding to her previous time at United perpetuated the prior disparate treatment of the "no marriage" policy, and (2) she was treated less favorably than males who were hired after her termination in 1968 but before her re-employment in 1972. *Id.* at 557, 97 S.Ct. 1885.

In finding no violation of Title VII, the *Evans* Court focused on the fact that the plaintiff was trying to recover for a prior violation for which the statute of limitations had already run:

> The fact that [plaintiff's] resignation was the result of an unlawful employment practice is irrelevant for purposes of these proceedings because plaintiff lost her opportunity to redress that griev-

ance when she failed to file a charge within ninety days of February, 1968. *Id.* at 556, 97 S.Ct. 1885. The Court stressed that there was no allegation of any conduct by United within the statute of limitations that amounted to disparate treatment on the basis of gender. While male employees hired after her discharge but before her rehiring may have had more seniority than she did, despite less total service, this was equally true of female employees hired after her discharge:

> Nothing alleged in the complaint indicates that United's seniority system treats existing female employees differently from existing male employees, or that the failure to credit prior service differentiates in any way between prior service by males and prior service by females.

*Id.* at 557, 97 S.Ct. 1885. Although neither the plaintiff nor the Court explicitly discussed "disparate impact," the Court noted that under the seniority defense of 703(h), a facially neutral bona fide seniority system can only be challenged as discriminatory if adopted with an intent to discriminate:

> Since [plaintiff] does not attack the bona fides of United's seniority system, and since she makes no charge that the system is intentionally designed to discriminate ... [§ ]703(h) provides an additional ground for rejecting her claim.

*Id.* at 560, 97 S.Ct. 1885. Thus, the Court implicitly held that § 703(h) would foreclose any claim that the airline's facially neutral seniority system had a present disparate impact on women.[8] Because the plaintiff could show no present violation of Title VII, she could not maintain her claim. *See Evans*, 431 U.S. at 558, 97 S.Ct. 1885 ("the critical question is whether any pres-

---

8. *See supra* notes 3 & 7.

ent *violation* exists") (emphasis in original).

In this case, *Evans* is not controlling, because despite Defendant's assertions to the contrary, Plaintiffs are not trying to revive an untimely claim of disparate treatment or disparate impact based on the 2002 layoffs. The Plaintiffs explicitly disavow any notion that the 2002 layoffs violated Title VII, and are not claiming that PERS–4 perpetuated any other prior violation of Title VII. Rather, the Plaintiffs are claiming an independent, present violation of Title VII (application of the PERS–4 policy) falling within the statute of limitations, which has been properly administratively exhausted. In such cases, *Evans* has limited application. See *Cardenas v. Massey*, 269 F.3d 251, 256 (3d Cir. 2001) (holding that *Evans* is inapposite where plaintiff alleges ongoing discriminatory conduct within the statute of limitations); *see also Anderson v. Zubieta*, 180 F.3d 329, 336–37 (D.C.Cir.1999); *Taylor Warehouse Corp. v. NLRB*, 98 F.3d 892, 900 (6th Cir.1996); *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 511 (6th Cir.1991); *Held v. Gulf Oil Co.*, 684 F.2d 427, 430 (6th Cir.1982); *Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 760–61 (9th Cir.1980).

Unlike *Evans*, this case involves a timely allegation of present disparate impact. In *Walker v. Jefferson County Home*, 726 F.2d 1554 (11th Cir.1984), the Eleventh Circuit found *Evans* inapplicable where the plaintiff alleged that a current employer policy had a disparate impact on African–Americans, even though the reason why that policy had a disparate impact was discriminatory conduct by the employer well beyond the statute of limitations. *Id.* at 1557 n. 1. *Walker* involved an African–American nurse's aide who sought a supervisory position at the nursing home where she worked. *Id.* at 1556. She was denied

the position because she could not meet the nursing home's facially neutral requirement that applicants have prior supervisory experience at the home. *Id.* However, the district court found that the nursing home had previously had a "policy, practice, or pattern" of favoring whites over blacks for supervisory positions. *Id.* at 1557. Although this conduct was too far beyond the statute of limitations to be the basis of an independent claim, the Eleventh Circuit held that the nursing home's current policy of requiring supervisory experience had a disparate impact on African–Americans. *Id.* at 1558.

In this case, as in *Walker*, the employer's prior conduct outside the statute of limitations is not the basis for the action, but merely "constitute[s] relevant background evidence in a proceeding in which the status of a current practice is at issue." *Evans*, 431 U.S. at 553, 97 S.Ct. 1885. The 2002 layoffs may explain why PERS–4 disproportionately affected women; however, the Plaintiffs' disparate impact claim centers on PERS–4, not on the layoffs. Thus, *Evans* does not apply to bar Plaintiffs' timely claim that PERS–4 had a disparate impact on female employees.

In arguing that *Evans* bars the Plaintiffs' claim, Defendant asserts that the denial of the opportunity to compete for management positions was merely an "effect" of the 2002 layoffs. However, as discussed in detail in the previous section, the Plaintiffs have adequately alleged that PERS–4, and not the 2002 layoffs, was the cause of the alleged gender disparity in management positions. Accordingly, Defendant's argument based on *Evans* must be rejected.

## V. CONCLUSION

To make out a prima facie case of disparate impact in a Title VII gender discrimination case, the plaintiff need only point

out the relevant gender disparity and identify the particular employment practice that allegedly caused it. The burden then shifts to the employer to offer a business justification for the practice—which in many cases, it can. At this early stage of the litigation, the only question before me is whether Plaintiffs have passed the first, low hurdle to prevailing on their claim of disparate impact. In holding that Plaintiffs have alleged enough to state a prima facie case for disparate impact, I am now merely requiring that the Defendant produce some business justification for its promulgation and enforcement of PERS–4.

### ORDER

**AND NOW,** this 30th day of December, 2005, upon consideration of Defendant's Motion for Judgment on the Pleadings, or in the Alternative, for Summary Judgment (Doc. # 28), it is **ORDERED** that:

(1) Defendant's Motion for Judgment on the Pleadings (Doc. # 28) is **DENIED**;

(2) Plaintiffs' Motion for Continuance of Defendant's Alternative Motion for Summary Judgment Pursuant to Rule 56(f) (Doc. # 31) is **DENIED AS MOOT**; and

(3) the Court will schedule a telephone conference to discuss Plaintiffs' Motion for Precertification Class Discovery.[9]

---

9. My Order of June 24, 2005 (Doc. # 30) denied Plaintiffs' Motion for Precertification Class Discovery without prejudice to reassert after my disposition of Defendant's Motion for Judgment on the Pleadings.