**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 12a0491n.06

**No. 10-2304**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| BEN UPTON, | ) | **FILED**<br>***May 11, 2012***<br>LEONARD GREEN, Clerk |
| Plaintiff-Appellant, | ) | |
| v. | ) | **ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN** |
| CITY OF ROYAL OAK; JIM ELLISON; TOM HOOVER; MARY JO DIPAOLO; C. BRIAN JAMES, | ) | |
| Defendants-Appellees. | ) | |

**BEFORE: SILER, ROGERS, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Ben Upton appeals the district court's grant of summary judgment to Defendant City of Royal Oak, his former employer, and the individual Defendants,[1] City officials he alleges participated in terminating his employment as a firefighter/paramedic. Upton alleged that Defendants terminated him in retaliation for his speech and activities in support of a ballot proposal that called for a minimum ratio of firefighters to Royal Oak's population (the manning initiative), deprived him of due process both pre- and post- his termination, and participated in a civil conspiracy. We AFFIRM in part and REVERSE in part.

---

[1]Defendant Ellison was the Mayor of Royal Oak at all pertinent times, Defendant Hoover the City Manager, Defendant James the Assistant City Attorney, and Defendant DiPaolo the Director of Human Resources.

No. 10-2304
*Upton v. City of Royal Oak, et al.*

# I

Upton began employment as a firefighter for Defendant City of Royal Oak (the City) in February 1992, and became president of the firefighters' union in 1996, an office he held at all pertinent times. In the face of the City's considering substantially reducing firefighter personnel, Upton and the firefighters petitioned in the spring and summer of 2004 to place the manning initiative on the November 2004 ballot. The initiative caused discord between Upton and City officials.

## Upton's on-the-job injury - June 8, 2004

On June 8, 2004, during the period when Upton and the firefighters were petitioning for the manning initiative, Upton slipped and fell from a fire truck after fighting a fire. He was admitted to the hospital and diagnosed with shoulder and neck injuries, including acute myofascial cervical strain. From June 8, 2004, Upton was in and out of work, on light duty, sick leave and injury leave.

In the interim, Defendant Tom Hoover was appointed City Manager in the summer of 2004.

The City sent Upton for an independent medical examination (IME) by Dr. Xeller. Dr. Xeller wrote the City's insurer, Citizens Management, Inc., on January 4, 2005, that he had examined Upton six months after the June 8, 2004 work injury, and that Upton's resulting cervical strain had resolved. Upton returned to work but the fire chief sent him home because he was on medication.

Beginning in February 2005, Upton used his sick days, and sick days donated by other employees, and then was off work on leave without pay.

Upton filed a worker's compensation claim in April 2005. R. 37-24 at 2.

On April 16, 2005, one of Upton's neurosurgeons, Dr. Ho, determined that Upton was able to return to work without restriction as of May 4, 2005. Upton did so and worked for several weeks. However, following a check-up on May 31, 2005, Dr. Ho restricted Upton from lifting more than 35 pounds: "permanent restriction of no lifting greater than 35 lbs dx 721.0 cervical spondylosis.[2]" Upton reported to work the following day but was told to go home.

On June 28, 2005, Defendant Assistant City Attorney C. Brian James sent a memorandum to Defendant City Manager Hoover stating that Upton should be and was offered a police dispatcher position because the City was on weak ground in the worker's compensation case and that Upton had accepted the offer:

> The City Manager [Defendant Hoover] and the Mayor [Defendant Jim Ellison] and the City Commission may be aware that firefighter Ben Upton has been off work due to medical reasons for the past several months. For the beginning of that time the City was paying worker's compensation benefits and then those benefits were terminated by the City. Since the termination of the w/c benefits Upton has been using his sick bank and days proffered to him by other firefighters. For the past month he has been on leave without pay. Upton has long ago exceeded the 60 [day] maximum for light duty in the fire department. There is an upcoming mediation hearing regarding the worker's comp case for Thursday. After consultation with and between the City's worker's comp attorney, [Defendant] MJ Dipaolo [*sic*], Human Resources Director and our own office, it has been concluded that the best case for the City would be to offer Upton a job within the ROPOA as a PSA (dispatcher). Upton accepted the position today. The City will drop its contest (we are advised that the City is in a very precarious position in that litigation anyway) to the previously suspended worker's comp benefits. This resolution provides several plusses [*sic*] for the City. It may also provide a minus or two when one or both of the police and fire unions file a grievance(s).

---

[2]Cervical Spondylosis is a disorder in which there is abnormal wear on the cartilage and bones of the neck (cervical vertebrae), and a common cause of chronic neck pain. *See* MedlinePlus Medical Encyclopedia at www. nlm.nih. gov/ medlineplus/ ency/ article/ 000436.htm.

The City will avoid most of the cost of continuing to contest the w/c matter at which we are advised is extremely unlikely for the City to prevail. We will have the comp lawyer continue to pursue discovery as to Upton's "side job". The City at least halves its exposure for paying Upton w/c or disability benefits. By employing Upton the City gets a dispatcher position filled without paying extra benefits to a new hire. The City reduces its w/c exposure from 80% of $70,000 +/- to providing the difference between the dispatcher's salary ($34,000-$38000) and the 80% of the firefighter salary. In round numbers that reduces the City's liability by not less than 50% without taking into account the added benefit of not paying additional benefits to a brand new PSA. The City avoids creating a new "light duty" past practice at the fire department. The City creates a new "past practice" of slotting the injured elsewhere in the City, IF a position is vacant and appropriate . . . . The w/c agency will mandate that Upton participate in voc rehab to try to return Upton to full health. The dispatcher job may provide added incentive to Upton to rehab himself to try to expedite his return to full time duties at the fire house. As always, I thank you and MJ Dipaolo [*sic*] for your cooperation. Please call me if you have any questions . . .

R. 37-6. That afternoon, Defendant City Manager Hoover forwarded Defendant Assistant City

Attorney James's memo to the City Commissioners stating:

The attached report from Brian James in the Attorney's Office is forwarded to you for your information. We have been dealing with Mr. Upton's Workers Comp case for the past several months. The solution that Mr. James describes has been thought out by [then-City Attorney] Mr. Semchena[3], Mr. James, Ms. Dipaolo [*sic*],the Workers' Comp Attorney and myself.

In approving the filling of vacant positions in the Police Department last week by the Commission, we included the filling of the vacant PSA position. By filling it in this fashion, we resolve several matters, as described by Mr. James.

I plan on moving forward with this resolution unless any of you have concerns. It is an administrative resolution that I strongly recommend. I must implement this by this Thursday, which is the end of the month.

R. 37-6 at 2.

---

[3]Semchena was apparently Defendant James's boss and Royal Oak's City Attorney until he retired in September 2005. R. 37-25 at 8.

However, Defendants withdrew the dispatcher position offer the following day, and offered Upton a part-time, non-union position as a code enforcement officer, which he declined because it was an at-will position and the City was implementing layoffs at the time.

Upton consulted with another neurosurgeon, Dr. Sidhu, who, by letter dated June 30, 2005, disagreed with Dr. Ho, noting that he had seen Upton and "[a]t this stage, clinically he does not need operative intervention. From my viewpoint, he can return to work without restrictions and I gave him a note for that." R. 37-11 at 2.

In late July 2005, the City and its Insurance Adjuster, Donna Hart, sent Upton for a functional capacity test at Beaumont Health Centers Work Ability Program. The attending physical therapist recommended that Upton undergo a work-hardening program. *See* R. 30-8 at 17-18 ("It would appear that Mr. Upton would be a good candidate for a work hardening program. The program would focus on increasing his overall strength and endurance, as well as tolerance to job related postures and positions and duties that he would entail as a paramedic as well as a firefighter. . . . If Mr. Upton was to enroll in work hardening, he would need a physician prescription as well as insurance authorization.")

Insurance Adjuster Hart testified on deposition that she decided against approving the work-hardening program because the rehabilitation specialist who conducted Upton's study could not guarantee that Upton would be able to return to work at full capacity.

The City sent Upton for another IME by orthopedic surgeon Dr. Mayer, who concluded that Upton was able to return to work without restriction. *See* R. 30-8 at 16 ("After reviewing the MRI films, my opinion as dictated on June 24, 2005, remains unchanged. I find no objective reason to

indicate any need for permanent restrictions or restriction from return to full unrestricted work place activities.")

In the meantime, Defendant Human Resources Director DiPaolo worked with Insurance Adjuster Hart on Upton's worker's compensation claim. Hart testified that Citizens Management's worker's compensation attorney, Paula Murray, sent her the following on[4] August 24, 2005:

> ATTORNEY CONTACT 8/11/05
> Just finished the conference call on Ben Upton. He has retained an attorney, Mr. Akhtar, who was in on the telephone conference . . . .
>
> It is Mr. Upton's position that he did not report to work at the part time code enforcement job which the city offered via email, because it was not the job that had been discussed in his meeting with the City. He claims that he tried to call the City for clarification, but had no response to his calls.
>
> His attorney has suggested that the principals get together in a face to face meeting to see if we can hammer out an agreement regarding a potential return to work. Given my understanding that the City wants to push this man into a disability retirement, I do not know that they would entertain. This needs to be discussed with them. I would suggest a conference call.
>
> The file has been placed on a continued mediation date of 8/24/05 at 10:00 . . . . Please advise how you wish to proceed.

R. 37-22 at 2. A second "Notepad Detail" dated September 12, 2005, states:

> EMPLOYER/INSURED CONTACT
>
> meeting with si [self insured] on 9/8/05 claim discussed in detail the ee [employee] will have a meeting with the disability board we will await to see if they are going to turn him down for duty disability or force him into regular retirement. maryjo [Defendant DiPaolo] will provide the board all information we have gathered as well as dr mayer ime we are hopeful they will code it a regular retirement. If they do give

---

[4]Hart testified these were excerpts of emails she received and saved to her Notepad.

No. 10-2304
*Upton v. City of Royal Oak, et al.*

him a duty disability it will certainly hurt our wc case. The meeting is on 9/21 our new trial date is 10/12/05.

R. 37-21 at 2.

**Defendants involuntarily retire Upton**

Around September 2005, Defendants applied to the City's Employees Retirement System Board of Trustees[5] for Upton to be retired on a disability. In mid-September, Upton received notice that his retirement would be considered at a Board of Trustees meeting on September 21, 2005. Defendants provided each member of the Board a large packet of documents pertinent to Upton in advance of the meeting; the packet included extensive medical and payroll records.

In advance of the meeting, Defendant Human Resources Director Mary Jo Di Paolo sent a memo to the Board of Trustees dated September 15, 2005, stating:

> Ben Upton is a 15-year [*sic* 13-year] fire fighter with the City . . . Mr. Upton alleges that on June 8, 2004 he fell from a Fire Department vehicle causing an injury that prevents him from performing the essential duties of a Royal Oak fire fighter.
>
> From June 8, 2004 until May 31, 2005 Mr. Upton has been in and out of work on injury leave, light duty and sick leave. Please refer to the enclosed payroll records. On May 31, 2005, Mr. Upton's personal physician stated that he must work light duty on a permanent basis. The Fire Department has a light duty provision for only 60 days, which has been exhausted. Because Mr. Upton's leave banks were depleted, he has been on leave without pay since that time. Due to Mr. Upton's claim that he is permanently unable to perform the essential duties of a fire fighter, the City Manager has applied to the Retirement Board to place him on disability retirement.

---

[5]Defendant City Manager Hoover was on the five-member Board of Trustees. R. 30-6 at 26. The remaining four members were Jan Hunt, chairperson; Ron Race; Pat Cappello and Michael Andrzejak. R. 37-19 at 3.

-7-

R. 37-19 at 2. Defendants Hoover and James asked the Board of Trustees to determine whether Upton's on-the-job injury was the cause of his disability and whether to retire Upton on a non-duty disability. As Hoover and James recommended, the Board concluded that Upton's disability was not duty-related and voted to involuntarily retire him on a non-duty disability.

**Worker's Compensation proceeding**[6]

In 2007, several years after Defendants terminated Upton's employment, his worker's compensation claim went to trial. The worker's compensation magistrate issued her decision in May 2009, after Upton filed the instant suit, and held that Upton "met his burden in establishing that but for the work related injury he sustained on June 8, 2004, he would have been able to continue to work as a firefighter until such time that he reached regular retirement age." R. 37-24. The magistrate observed: "the City's decision as to which [medical] opinion to rely upon was arbitrary and capricious, when the City choose [*sic*] not to use the same doctor's opinion in determining whether the plaintiff's disability was work related as they did to make the determination that he was disabled," that "After listening to the testimony of all of the witnesses I am left with the distinct impression that plaintiff not being allowed to return to work was due to a political and financial agenda" and that "[t]here had been preceden[t] that would have allowed plaintiff, an experienced employee, to remain on the job in a restricted capacity. Mary Jo Di Paolo made the decision to follow a previously ignored rule that only allowed an employee to work sixty days in a restricted capacity." R. 37-24.

---

[6]Defendants submitted excerpts of testimony given in the worker's compensation case in support of their motion for summary judgment, and Upton submitted the magistrate's opinion.

## II - FIRST AMENDMENT RETALIATION CLAIM

This court reviews de novo a district court's determination to grant summary judgment. *Sowards v. Loudon Cnty., Tenn.*, 203 F.3d 426, 431 (6th Cir. 2000). Summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. This court views inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. *Id.*

> In determining whether a public employer has violated the First Amendment by firing a public employee for engaging in speech, the Supreme Court has instructed courts to engage in a three-step inquiry. First, a court must ascertain whether the relevant speech addressed a matter of public concern . . . a question of law for the court . . . .
>
> Second, if we conclude that an employee's speech involved a matter of public concern and was not made pursuant to the employee's official duties, we then must balance the interests of the public employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. Defendant bears the burden of demonstrating that legitimate grounds existed justifying the termination. *Rodgers* [*v. Banks*], 344 F.3d [587,] 596 [6th Cir. 2003] quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) . . . .
>
> Finally, we must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee. *Rodgers*, 344 F.3d at 596 (citing *Mt. Healthy City Sch. Dist Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977), and *Perry v. McGinnis*, 209 F.3d 597, 604 (6th Cir. 2000).

*Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180-81 (6th Cir. 2008) (most internal citations and quotations omitted). "Usually, the question of causation is a factual issue to be resolved by a jury, . . . and may be satisfied by circumstantial evidence." *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996) (internal citations omitted).

**A**

Defendants conceded for purposes of summary judgment that Upton's speech was constitutionally protected and that he suffered an adverse employment action, but argued that Upton failed to present evidence that would support a finding that his speech relating to the ballot initiative was a substantial or motivating factor in the decision to retire him or terminate his employment. Defendants also argued that Upton could not satisfy the causation element "due to the substantial time lapse between the protected speech and the adverse employment action."

**B**

Viewing the facts and inferences therefrom in a light most favorable to Upton, the First Amendment retaliation claim should have survived summary judgment. Upton, the president of the firefighter's union, circulated petitions in support of the manning initiative, which would cause the City charter to be amended and require the City to hire more firefighters. Upton testified on deposition that on or around June 28, 2004, Hoover called him twice and demanded that Upton pull the manning-initiative petitions back, saying that Upton would regret not having pulled them, that "if this goes through, you and the firefighters will end up with a black eye," and that "this will never end for you." R. 30-3 at 44-48. Upton testified that Defendant Mayor Ellison also called him in late June to ask him to pull the petitions. R. 30-3 at 51-53. Upton did not pull the petitions and Royal Oak voters approved the firefighters' manning initiative in November 2004.

In June 2005, after Defendants had conferred and offered Upton a police dispatcher position, Defendant City Manager Hoover determined that the offer be withdrawn. R. 37 at 10. Defendants claimed in the district court that they withdrew the offer because civil service rules required that the

position be posted, yet they did not explain why they discovered this only after Upton accepted their job offer, nor did they provide or cite the purportedly applicable civil service rule. R. 30-6 at 47-56.

Defendants Hoover and DiPaolo, who participated in determining to offer Upton the dispatcher position and in withdrawing the offer, and were instrumental in advancing the City's application to the Board to involuntarily retire Upton in September 2005, responded "I don't recall" at their depositions to dozens of questions addressing the withdrawal of the dispatcher position and their recommending to the Board that Upton be involuntarily retired on a non-duty disability.

Further, at the time that Defendants applied to the Retirement Board to involuntarily retire Upton in September 2005, three of the four doctors that had examined Upton, including the City's two doctors that had conducted IMEs, had cleared him to return to work as a firefighter without restriction. In addition, the physical therapist that tested Upton on the City's request recommended that Upton undergo a work-hardening program. Nonetheless, Defendants recommended to the Retirement Board of Trustees that Upton be involuntarily retired on a disability. Board of Trustees member Race testified on deposition that in all his years on the Board, the City had never submitted such a retirement application to the Board and that the City's action was unusual because "Ben had only been off for about three to four months, something in that time frame. We had people in the police department I was specifically aware of were off for a year before they were put on disability." R. 30-7.

Viewing the facts and inferences therefrom in a light most favorable to Upton, a reasonable jury could infer that Upton's political speech and activities in support of the firefighter manning

initiative were a substantial or motivating factor in Defendants' withdrawal of the offer of the police dispatcher position and in terminating Upton's employment by retiring him.

We are not persuaded by Defendants' argument that too much time elapsed between Upton's protected speech and activities and Defendants' adverse actions to support a causal connection between the two.

Upton counters this argument by maintaining that Defendants could not have taken adverse actions against him while he was on worker's compensation leave, i.e., until he returned to work. The record supports this argument. Beginning in February 2005, Upton used sick days, and sick days donated by other employees, and then was off work on leave without pay. Dr. Ho approved Upton's return to work without restriction effective May 4, 2005, and Upton returned to work for several weeks. On May 31, 2005, Dr. Ho restricted Upton to lifting no more than 35 pounds, and Upton again was off work. Defendants offered Upton a police dispatcher position in late June 2005, but then immediately withdrew it. Defendants then offered Upton a part-time at-will position at a time that the City was implementing layoffs.

A reasonable jury could conclude based on this evidence that within 1 1/2 months of Upton's brief return to work in May 2005, Defendants offered but immediately withdrew the police dispatcher offer, which would have provided Upton benefits and continued his union membership, and then offered him a part-time position with no job security or benefits. A reasonable jury could also conclude that soon after Upton's physician, Dr. Sidhu, cleared him to return to work without restrictions on June 30, 2005, Defendants decided to terminate Upton's employment by applying to the Retirement Board to involuntarily retire him. *See, e.g.*, R. 37-22 at 2 (August 24, 2005 email to

Insurance Adjuster Hart from insurer's worker's compensation attorney stating "Given my understanding that the City wants to push this man into a disability retirement, I do not know that they would entertain [negotiating with Upton and plaintiff's counsel a return to work for Upton.]"

The only case Defendants cite in support of their argument that too much time elapsed between Upton's protected activities and Defendants' adverse actions to support a causal connection between the two, *Wallscetti v. Fox*, 258 F.3d 662 (7th Cir. 2001), is not binding on this court and, in any event, is distinguishable. *Wallscetti* states that "*without more*, [the four-month time lapse] is too long to support a reasonable inference of causation." 258 F.3d at 669 (emphasis added). In *Wallscetti*, the threats the plaintiff pointed to as evidence of retaliatory motive were made by the plaintiff's subordinate, and the plaintiff provided no evidence to support that those who decided to terminate her relied on the subordinate's opinion in deciding to terminate her employment. *Id.* In contrast, in the instant case, the alleged threats were made by Upton's superior, Defendant City Manager Hoover, who also withdrew the offer to Upton of a police dispatcher position, advocated that the City involuntarily retire Upton, and voted to involuntarily retire him on a non-duty disability.[7]

---

[7]We reject Upton's argument that the Worker's Compensation magistrate's determination that the City acted arbitrarily and capriciously by relying on one doctor's opinion on the question whether Upton was disabled, and on a different doctor's opinion on the question whether his disability was due to an on-the-job injury, is res judicata. The magistrate did not resolve a disputed fact essential to both the worker's compensation proceeding and the instant action. *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 210 (6th Cir. 2010). In the worker's compensation proceeding, the factual dispute was whether Upton was disabled and whether his disability was work related. Here, the factual dispute is whether Upton's First Amendment speech and activities were a substantial or motivating factor in the City's adverse actions against him.

We conclude that Upton's First Amendment retaliation claim was improperly dismissed.

### III - PROCEDURAL DUE PROCESS

Upton asserts that although he received notice that the Board of Trustees would consider his retirement at the September 21, 2005 meeting, he 1) did not receive oral or written notice of the charges against him, 2) did not receive an explanation of the employer's evidence, and 3) did not have opportunity at the hearing to present his side of the story.

The Due Process clause of the Fourteenth Amendment provides that certain substantive rights, including a property right in continued employment, "cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). "The essential requirements of due process . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." *Id.* at 546.

> To establish a procedural due process violation under 42 U.S.C. § 1983, [the plaintiff] is required to demonstrate three elements:  (1) that it had a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that it was deprived of that protected interest within the meaning of the due process clause; and (3) that the [defendant] did not afford it adequate procedural rights before depriving it of its protected interest.

*Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio*, 610 F.3d 340, 350 (6th Cir. 2010).

"The tenured public employee[8] is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."

---

[8]Defendants do not argue that Upton did not have a protected property interest in continued employment, or that Upton was not deprived of his employment.

*Id*.; *see also Morrison v. Warren*, 375 F.3d 468, 474-75 (6th Cir. 2004). The pre-deprivation hearing need not be elaborate. If an employee is not afforded due process before the deprivation, then an adequate post-deprivation remedy may satisfy his right to due process of law. *Walsh*, 424 F.3d at 514.

As reflected in the minutes of the Board of Trustees' meeting, the City explained at the meeting its evidence against Upton and gave Upton an opportunity to respond to that evidence. Upton addressed the Board, requested that he be entered in a work-hardening program, and emphasized to the Board that he wanted to return to work as a firefighter. The minutes also reflect that Defendant James discussed Upton's medical records and explained that the City's position was that Upton's disability pre-dated his June 2004 on the job injury.[9] R. 37-19 at 3-7.

Thus, Upton received notice of the charges against him at the Board meeting and was afforded opportunity to respond to those charges. His claim that the pre-deprivation hearing violated his due process rights therefore fails.

Upton also argues that the district court clearly erred by ignoring his argument that he was deprived of a post-deprivation hearing. Upton asserts that he requested a post-termination hearing before the Civil Service Commission and that Defendant James told the Commission that it could not properly hold a hearing as to the conduct and actions of the Retirement Board. R. 37 at 17-18.

---

[9]Upton had been treated for cervical strain before his June 2004 on-the-job injury, including in February 2004, when he woke up with severe neck pain. Following an MRI, the physician, Dr. Kerwin, by letter dated February 27, 2004, stated that Upton would be further evaluated by Dr. Sidhu, a neurosurgeon, and until then he was disabled from work. R. 30-9.

Upton does not address Defendants' argument that his proper recourse was not to file a direct appeal to the Civil Service Commission, but rather, to initiate a grievance under the collective bargaining agreement between the City and the firefighters' union. In this regard, Upton testified on deposition that he verbally requested that the union file a grievance and was told it would be done, but that it did not happen as far as he knew. R. 3-0-3 at 28. He also testified that the union was refusing to pursue his previously filed grievances. These are not matters properly resolved by this court; they are between Upton and the firefighters' union. On the record before us, Upton's claim that he was denied a post-deprivation hearing is without support. *See also Jefferson v. Jefferson Cnty. Public Sch. Sys.*, 360 F.3d 583, 588 (6th Cir. 2004) ("If satisfactory state procedures are provided in procedural due process case, then no constitutional deprivation has occurred despite the injury," citing *Hudson v. Palmer*, 468 U.S. 517, 533 (1984)).

## IV - QUALIFIED IMMUNITY

Upton challenges the district court's alternative determination that the individual Defendants were entitled to qualified immunity. This affirmative defense shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Cochran v. Gilliam*, 656 F.3d 300, 306 (6th Cir. 2011).

The First Amendment protects government employees' right to speak out on matters of public concern without reprisal from their employer. *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1185 (6th Cir. 1995). "The circulation of initiative and referendum petitions involves 'core political speech,' and is, therefore, protected by the First Amendment." *See Pest Committee v. Miller*, 626

F.3d 1097, 1106 (9th Cir. 2010), quoting *Meyer v. Grant*, 486 U.S. 414, 421 (1988). We determined above that Upton presented sufficient evidence that his protected speech and activities[10] were a substantial or motivating factor in Defendants' adverse employment actions against him to survive summary judgment. *Id.* And, Upton's right to engage in speech on matters of public concern was clearly established in 2005, when Defendants took adverse employment actions against Upton. *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 580 (6th Cir. 1997) (observing that "[a]ll public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern.") We therefore vacate the district court's alternative determination that the individual Defendants were entitled to qualified immunity.

## V

Upton also challenges the district court's determination that Defendant City, a municipality, was not subject to liability. Upton's appellate brief states in the heading on this issue that the district court erred in finding that municipal liability cannot be imposed unless injuries are inflicted pursuant to a policy or custom and then held that Upton failed to identify such a policy or custom. Upton is incorrect on both counts, as the district court's opinion evidences:

> Upton correctly notes that liability may be imposed upon a municipality for a single decision by a policymaker. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Under this theory Upton points to provisions in the Royal Oak City Charter which grant executive rule making authority to the law department and the City Manager.

---

[10]Defendants' motion for summary judgment stated "we will assume for the purposes of this motion only that Plaintiff's alleged speech as it related to the ballot initiat[ive] was constitutionally protected," but argued that Upton failed to present evidence that would support a finding that his speech relating to the ballot initiative was a substantial or motivating factor in the decision to retire him.

> Then, looking to the scope of their power as municipal executives, Upton claims that the Defendants, James and Hoover, exposed the City to liability as the result [*sic*] their comments about the probability of losing its worker's compensation case. Unfortunately, Upton's argument on this issue is confusing and somewhat convoluted. Because this issue was not properly briefed and analyzed – and he has not presented any persuasive argument or authority to rebut the Defendants' argument – the motion for summary judgment in favor of the City on this ground will be granted.

R. 48 at 14-15.

Defendant City had argued in the district court that although municipal liability can attach under *Pembaur*, the City's policy with respect to eligibility for retirement is established through the collective bargaining process, and none of the individual Defendants or City had unilateral authority to create or amend that policy, implementation of the policy was delegated to the Retirement Board, and that even the Retirement Board had no power to amend the policies established in the collective bargaining agreement. R. 46 at 4-5.

Because Upton did not counter this argument below and, on appeal asserts (other than in a heading) only that Defendants' motion is premature and should be left for trial, summary judgment was properly granted.

## VI

Upton's final challenge is to the district court's dismissal of his conspiracy claim. Upton's complaint alleged:

> 24. Defendants acting in concert with one another, illegally, maliciously, and wrongfully conspired with one another with the intent to and for the illegal purpose of terminating Plaintiff's employment against his will and because of his action in refusing to withdraw his petition to have a minimum staffing pattern made part of the city charter.

25. This conspiracy resulted in the illegal, unlawful, or tortious activity of illegally and without proper cause in the termination of Plaintiff's employment with the City of Royal Oak. As a result of the conspiracy and Defendants['] illegal, wrongful and tortious act, Plaintiff sustained the following damages . . . .

Defendants argued below that the intra-corporate conspiracy doctrine barred this claim, relying on one Sixth Circuit decision, *Hull v. Cuyahoga Valley Joint Vocational School District Board of Education*, 926 F.2d 505, 510 (6th Cir. 1991), and one unpublished decision of the Michigan Court of Appeals, *Tropf v. Holzman & Holzman*, Nos. 257019, 25783, 2006 WL 120377 (Mich. Ct. App. Jan. 17, 2006) (unpublished).

In *Hull*, this court observed:

> To sustain a cause of action under 42 U.S.C. § 1985(3), a plaintiff must prove the existence of a conspiracy among "two or more persons." Plaintiff alleges that district superintendent Schuck, executive director Plance, and vocational supervisor Romes conspired together to deprive her of her constitutional rights. Defendants argue that the "intra-corporate conspiracy" theory bars this claim. The theory states:
>
> > It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.
>
> *Nelson Radio & Supply Co., Inc. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir.1952), *cert. denied*, 345 U.S. 925 [] (1953).
>
> We agree with defendants. This court has adopted the general rule in civil conspiracy cases that a corporation cannot conspire with its own agents or employees. *Doherty v. American Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984). Although the doctrine was first developed in the context of antitrust litigation, this court in *Doherty* stated, "[T]he same rule has been consistently applied in allegations of conspiracy under the Civil Rights Act." *Id*. This court in *Doherty* agreed with a second circuit decision, *Herrmann v. Moore*, 576 F.2d 453 (2nd Cir.1978), which applied the "intra-corporate conspiracy" doctrine to bar the plaintiff's § 1985(2) claim. In *Herrmann*, the plaintiff

had alleged a conspiracy between an educational corporation, the Brooklyn Law School, and its trustees and employees. In the present case, plaintiff is alleging a conspiracy between a school district superintendent, the executive director of the district, and a school administrator, all of whom are employees or agents of the Board. Since all of the defendants are members of the same collective entity, there are not two separate "people" to form a conspiracy. We believe that this court's opinion in *Doherty* is dispositive of this issue. The district court's grant of defendants' motion for summary judgment on the § 1985(3) claim is hereby affirmed on this ground.

*Hull*, 926 F.2d at 509-10.

In *Tropf*, the Michigan Court of Appeals affirmed the dismissal of the plaintiffs' civil conspiracy claim, concluding that they had failed to raise a genuine issue of material fact:

Plaintiffs first argue that summary disposition was inappropriate on the civil conspiracy claim because they presented documentary evidence that created a genuine issue of material fact. We disagree. The essential elements of a civil conspiracy are: (1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose (4) or a lawful purpose by unlawful means. *Admiral Ins Co v Columbia Casualty Ins Co*, 194 Mich App 300, 313; 486 NW2d 351 (1992). Defendants correctly argued that there could be no civil conspiracy if they were acting as agents within the scope of the agency agreement. The intra-corporate trust doctrine holds that a cause of action does not exist for civil conspiracy between a corporation and its agents acting within the scope of their employment. *See, e.g.*, *Landmark Sav & Loan v Loeb Rhoades, Hornblower & Co*, 527 F Supp 206, 209 (ED Mich, 1981). The intra-corporate conspiracy doctrine was first developed in an anti-trust case, *Nelson Radio and Supply Co v Motorola*, 200 F.2d 911 (CA 5, 1952), and the United States Court of Appeals for the Sixth Circuit subsequently adopted the doctrine in that context. *See, e.g.*, *Nurse Midwifery Assoc v Hibbett,* 918 F.2d 605, 615 (CA 6, 1990). Other jurisdictions have applied the intra-corporate conspiracy doctrine to bar conspiracy actions in other contexts where the agent is acting within the scope of his authority. *See, e.g.*, *Hodges v. Tomberlin*, 510 F Supp 1280, 1286 (SD Ga, 1980); *Renner v Wurdemen*, 231 Neb 8, 16; 434 NW2d 536 (1989); *Soft Water Utilities, Inc v LeFevre*, 159 Ind App 529, 539; 308 NE2d 395 (1974).

In *Blair v Checker Cab Co*, 219 Mich App 667, 674; 558 NW2d 439 (1996), this Court, although not addressing the precise question at issue in this case, noted that "an agent or employee cannot be considered a separate entity from his principal or

> corporate employer, respectively, as 'long as the agent or employee acts only within the scope of his agency [or] employment. *Id.*, quoting *Metro Club, Inc v Schostak Bros & Co, Inc*, 89 Mich App 417, 420; 280 NW2d 553 (1979). "An attorney often acts as his client's agent, and his authority may be governed by what he is expressly authorized to do as well as by his implied authority. *Uniprop, Inc, v Morganroth*, 260 Mich App 442, 447; 678 NW2d 638 (2004).
>
> Here, plaintiffs failed to present any evidence that defendants were acting as anything other than agents within the scope of their agreement when the alleged fraud occurred. Plaintiffs presented evidence that defendants acted for Lynne Wolenski and 20th Century Corporation in the mortgage license application process and at the land contract forfeiture hearing. However, the allegation that defendants participated in Wolenski's fraudulent behavior was not supported by any evidence. Karl Tropf admitted that Holzman never made any representations to plaintiffs. Plaintiffs presented no evidence that defendants had any knowledge that the deed or land contract were fraudulent. Plaintiffs also did not present evidence to support their conclusion that Wolenski would not have received a mortgage license without defendants' letter of support. Plaintiffs' conclusion that they would not have lost their house if defendants had not supported Wolenski's application is speculative, especially because plaintiffs stopped making mortgage payments and their house was sold in a forfeiture sale over one year before Wolenski offered them a land contract in order to redeem their property.

*Tropf*, 2006 WL 120377, at *1-2.

Upton argued in response to Defendants' motion for summary judgment that an action for civil conspiracy is recognized under the facts presented here, relying on *Cranford v. Wayne County Sheriff*, No. 218859, 2001 WL 637408 (Mich. Ct. App. May 25, 2001) (unpublished), in which the plaintiff, a deputy chief in the Wayne County Sheriff's Department, alleged that the Wayne County Sheriff and the chief of operations upheld his demotion and termination of his employment. The plaintiff alleged violation of the Whistleblower Protection Act, M.C.L. 15.362 *et seq*., and tort claims including civil conspiracy. The defendants moved for summary disposition for failure to state a claim and on the basis of governmental immunity; they did not raise the intra-corporate conspiracy

doctrine, nor did the court address it. The trial court granted the defendants' motion on both

grounds. The Michigan Court of Appeals reversed the dismissal of the whistleblower and civil

conspiracy claims, observing as to the latter:

> The trial court dismissed this claim because it concluded that "the failure of defendants to conduct a civil forfeiture indicates no unlawful purpose nor commission of a lawful purpose by unlawful means." However, plaintiff's complaint alleged that defendants ordered him to return already forfeited vehicles because the vehicles were seized from relatives of highly placed elected officials. Again, the allegations in plaintiff's complaint are not directed at the initial discretionary decision whether to seize a vehicle. Instead, plaintiff's claim implicates defendants' conduct at a point where defendants no longer had discretion to determine which vehicles to seize. Accepting plaintiff's allegations as true, we find that they sufficiently allege an unlawful purpose, and the trial court erred in dismissing the civil conspiracy claim pursuant to MCR 2.116(C)(8) [failure to state a claim; the equivalent of Fed. Rule of Civ. Pro. 12(b)(6)].
>
> We similarly conclude that defendants were not entitled to summary disposition of the conspiracy claim pursuant to MCR 2.116(C)(7) on the basis of governmental immunity. State agencies are immune from tort liability if they are "engaged in the exercise or discharge of a governmental function" at the time the alleged tort occurs. MCL 691.1407; MSA 3.996(107). A governmental function is an "activity which is expressly or impliedly mandated or authorized by constitution, state, or other law." An agency's *ultra vires* activities are not entitled to immunity.
> . . . .
> Here, plaintiff alleged that defendants acted in concert to violate state law by returning already forfeited vehicles to the sons of influential city politicians, and by asking plaintiff to cover up these violations by sweeping the reports involving these matters "under the rug." Although defendants had the discretion . . . to determine whether to seize the vehicles in question, the statute gives defendants no authority to revoke forfeitures. It is apparent that the conduct alleged in plaintiff's complaint would not be within the scope of defendant's authority and, therefore, would not be protected by governmental immunity. We conclude that the trial court erred when it dismissed plaintiff's civil conspiracy claim.

*Cranford*, 2001 WL 637408, at \*5 (some internal citations omitted).

Thus, *Cranford* did not involve the intra-corporate conspiracy doctrine.

The district court in the instant case agreed with Defendants that the intra-corporate conspiracy doctrine barred Upton's claim, and concluded that because Upton had not addressed the doctrine, he had defaulted on this issue:

> Upton's claim must fail based on the intra-corporate conspiracy doctrine, which provides that a corporation cannot conspire with its own agents or employees. *Doherty v. American Motors Corp.*, 728 F.2d 334, 339 ([6th Cir.] 1984). Where all of the defendants are members of the same collective entity, the law does not recognize the existence of two separate "people" to form a conspiracy. *Hull v. Cuyahoga Valley Joint Vocational School Dis. Board of Education*, 926 F.2d 505, 510 (6th Cir. 1991) (applying intra-conspiracy doctrine to a school district superintendent, the executive director of the district, and a school administrator, all of whom were employees or agents of the Board). Upton does not address this argument in his responsive brief, and, thus, he – by virtue of his silence – has defaulted on this issue. All of the individually named Defendants work as employees or agents of the City of Royal Oak. As such, under *Doherty*, and similar precedent, they all belong to one collective entity and thus cannot form a conspiracy with one another. The Defendants are therefore entitled to a summary judgment on this count of Upton's complaint.

R. 48 at 13-14.

On appeal, Upton argues that he did not default on this issue because he argued *Cranford* in response to Defendants' motion for summary judgment and *Cranford* "specifically recognizes that there is a cause of action where you have corporate conspirators." Pl.'s Br. at 44.

In any event, although Upton did not default on the issue, the district court's observations on the merits are nevertheless apt. We find this case indistinguishable from *Hull*, 926 F.2d 505, and find *Cranford* of little guidance both because the intra-corporate conspiracy doctrine was not discussed and because the conspiratorial acts alleged were not the retaliation in violation of the Whistleblower Protection Act, but the clearly ultra vires acts of returning the vehicles.

The district court thus did not err in determining that Upton's civil conspiracy claim was barred by the intra-corporate conspiracy doctrine.

**VII**

For the foregoing reasons, we **AFFIRM** the grant of summary judgment to Defendants on Upton's procedural due process claim, municipal liability claim, and civil conspiracy claim, **REVERSE** the grant of summary judgment on Upton's First Amendment retaliation claim, **VACATE** the grant of summary judgment to the individual Defendants on immunity grounds, and **REMAND** for further proceedings.